[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for the dissolution of a marriage. The parties were married on September 25, 1983, in Westport, Connecticut. They have lived in Connecticut for at least twelve months prior to the commencement of this dissolution action. There are five children issue of this marriage: Patrick born March 26, 1985; Jacqueline born May 29, 1986; Siobhan born October 23, 1988; Michaela born September 28, 1991; and Brendan born December 1, 1996. The children currently reside with their mother. This is the plaintiffs first marriage, the defendant's second. Both parties enjoy good health. The marriage has broken down irretrievably, and a decree of dissolution will enter on that ground.
The principal cause for the breakdown of the marriage was the fact that nearly all of the defendants free time was spent in pursuits that did not include the plaintiff or their children. Furthermore, the defendant had an adulterous relationship during the marriage. The court further finds that there had been some violence on the part of the defendant. The defendant's relatively egocentric personality precluded the maintenance of a mutually respectful relationship.
I. Facts of the Case
At the time of the court trial, the plaintiff was a forty-five year old, full-time homemaker and part-time certified nurse anesthetist. Prior to this marriage, she received a Bachelor of Arts degree in nursing from Southern Connecticut State University.
Upon the birth of the parties' first child, the plaintiff assumed the responsibilities of a fulltime mother and homemaker. She continued, however, to work as a nurse anesthetist on a part-time basis for the Medical Anesthesia Associates of St. Vincent's Hospital in Bridgeport, Connecticut (MAA). She has been with that institution since 1981. Her individual income and schedule varied throughout the years.[1] It is clear, however, that since the birth of the fifth Rotondi child, Brendan, the plaintiff limited herself to only one day per week as a nurse anesthetist.
As a nurse anesthetist at MAA, the plaintiff usually works from 8:30 a.m. to 4:00 p.m. nearly every Thursday, earning $42.00 per hour on those days she works.[2] As a per diem employee, the plaintiff does not CT Page 9220 receive any benefits. Additionally, her hours are subject to reduction should MAA not require her services on her scheduled work day.
Presently there are no daycare provisions for the Rotondi children.[3]
A family friend cares for Brendan on those days that the plaintiff works; the plaintiff in turn cares for her friend's child on a different weekday. Although the plaintiffs mother once provided childcare for the Rotondi children, because of ill health that individual is no longer available.
The defendant, also a certified nurse anesthetist, was forth-eight years old at the time of these proceedings. He received an associate's degrees in both nursing and respiratory therapy prior to this marriage. Although his work schedule has varied throughout the marriage, prior to the dissolution action he historically worked long hours in order to provide his family with a better environment. After the initiation of these proceedings, his hours decreased significantly.
The defendant's primary employer is Danbury Hospital. He has been there since 1982. Since the birth of his youngest child, the defendant has worked a second job, either at another hospital or for private physicians. In 1996 the defendant organized Ambulatory Anesthesia, a private enterprise through which he provided services for individual physicians, usually plastic surgeons, or hospitals. The defendant coordinated the services of several nurse anesthesiologists who worked as independent contractors in this enterprise. At one time the plaintiff worked for Ambulatory Anesthesia.[4] After the initiation of the present proceedings, the defendant eliminated all other sub contractors. He is now the sole nurse anesthetist for his organization. As a consequence, the company's income has decreased.
Because the defendant worked long hours outside the home, childcare and other household responsibilities fell to the plaintiff. As the children aged, their extracurricular activities increased. The plaintiffs tasks rose accordingly.[5] Although there is a critical shortage of nurse anesthetists, there is no evidence that those in need of these specialists would accommodate the plaintiffs desire for flexibility.[6]
In March 2000 the plaintiff discovered that the defendant was having an extramarital affair with a co-worker, Nancy Alison Moriber. That romance began in April 1999. During their romance, the defendant and Ms. Moriber spent a great deal of time together, time that included medical conferences in several locations throughout the Northern Hemisphere.[7]
When she initially learned of the affair, the plaintiff suggested that she and the defendant attempt reconciliation. Unfortunately, the CT Page 9221 defendant refused to accept some very reasonable conditions such as remaining home at least one night a week. Further, he complained that he needed more time alone. Finally, he continued his relationship with Ms. Moriber during the same time the plaintiff was arranging for retreats in order to save the marriage.[8]
Eventually the plaintiff began the instant dissolution proceedings. Although the defendant initially left the marital home, he returned shortly thereafter, complaining about the expense of maintaining two households. The defendant moved into separate living quarters in the marital home, but spent many of his nights with Ms. Moriber.
In June 2001 the defendant moved permanently to Ms. Moriber's home. He continues to reside there with Ms. Moriber, her two children and the children's au pair. The defendant contributes to the monthly expenses at the Moriber home.
Since the initiation of these proceedings, the defendant has attended medical conferences in resort locations with Ms. Moriber. Other vacations have also occurred, most notably a seven-day vacation in the Dominican Republic. The defendant has purchased a number of gifts for Ms. Moriber including a diamond tennis bracelet, earrings and a navel ring. In turn Ms. Moriber gave the defendant a motorcycle.
The defendant's extramarital affair caused a severe strain in this marriage, but it was not the only source of conflict. Although the defendant worked very hard, he spent virtually all of his free time in activities away from his family. He complained that the plaintiff had become distant physically and emotionally.
In his spare time, the defendant was an avid race car driver. He rebuilt his 1972 Porsche race car in the years since the birth of Brendan. That activity consumed great many hours, leaving little for the children's basic needs and extracurricular activities. The court credits the plaintiffs testimony that the defendant spent a total of approximately fifteen hours per week at home.[9] It is clear that at the time this action was filed, the parties led separate and distinct lives. They no longer respected each other. Their differences were irreconcilable.
The parties agreed to share joint legal custody of their five minor children whose primary residence would be with their mother. There are five active, healthy children, ranging in age from seventeen to five years old. Because of the differences in their ages, these children do not attend the same school. They certainly have different activities including part time jobs, community service, charity work, school and CT Page 9222 recreational athletics, religious education, student government and simple play.
The question raised at trial is not residential custody but rather visitation. The five children are true victims in the present situation. They are all loyal to both parents but have special devotion to their mother. Nevertheless, they also wish to have a relationship with their father.
The defendant's relationship with his children, once extremely pleasant, now can best be described as strained. He lays all blame on the plaintiff, claiming that the plaintiff has a vitriolic, critical attitude that inhibits his relationship with the children. Although the plaintiff surely has not encouraged the father-child bonding, she is not the cause of the schism. The defendant's flagrant disregard for his wife and his abandonment of the family unit are at the core of the problem.
Throughout the marriage the plaintiff was responsible for transporting the children to their various individual activities. She also provided meals, did all necessary shopping and errands, cared for the children during illnesses, accompanied the children to medical appointments, and provided child care during vacations and various other dates when school was not in session. In effect, the plaintiff was the custodial parent during the marriage, working daily between 5:30 a.m. and 10:00 p.m. She was forced to modify her nursing schedule to accommodate the children's needs. The defendant's participation in daily household activities was limited. He was more a spectator than a facilitator. Part of the problem was that the defendant worked hard; he also played hard.[10]
The marital discord that erupted upon the plaintiffs discovery of the defendant's affair eventually affected the children. Tensions arose. Arguments extended beyond those of the parties to this action. In November of 2000 the defendant had a brief dispute with his daughter, Jacqueline. Since that argument, Jacqueline has had limited contact with her father.
The family dynamics further deteriorated in December 2000. At that time, the defendant controlled the family finances. One evening the plaintiff requested money for household expenses. Rather than discuss the matter amicably, the parties argued. The confrontation accelerated; the defendant assaulted the plaintiff. The defendant was subsequently arrested and charged with a domestic violence offense.[11] The next month, the defendant slapped his oldest child, Patrick.[12]
As a result of the December incident, the defendant was arrested and charged with a domestic violence crime. The court in that matter issued a CT Page 9223 full protective order that, inter alia, barred the defendant from entering the marital residence. He initially moved to a basement room at his sister's home but in June 2001 relocated to the home of his current companion, Nancy Moriber. This is the environment during which the children exercised pendente lite visitation. It is the same atmosphere in which they will have post-judgment visitation with their father.[13]
The defendant's bond with Patrick has improved slightly in recent months. Patrick was understandably angry, confused and alienated. The two share several interests including cars and music.[14] Under the current arrangement, Patrick visits his father when time permits. It is a fairly fluid, flexible schedule.
Unfortunately, the defendant's relationship with his two oldest daughters has deteriorated. As does Patrick, Jacqueline and Siobhan also have the option of visitation. They choose not to exercise that opportunity. Consequently, the defendant has not seen Jacqueline since August 2001, Siobhan since October 2001. He does not speak to either child nor does he attend their individual activities.[15] Michaela visits every other weekend and Wednesdays but goes home to sleep in her own bed.[16] Brendan also visits every other weekend and Wednesdays but he remains overnight.
There is no doubt that the plaintiff does little to encourage the children in their relationship with their father. Consequently, the children are in an awkward position. However, there is a more compelling reason for the daughter's strained attitude toward their father. He abandoned the family unit. The children must sort out their feelings of rejection and anger before they can maintain a good relationship with their father.[17] The defendant naively presumes that his problems would be resolved if the plaintiff provided unbridled permission for the children to see their father. Although this act would certainly be helpful, the plaintiffs conduct is not the source of the defendant's current problem. The defendant, not the plaintiff, is responsible for fostering greater father-child relationships. He, not she, must facilitate visitation with the children's extended paternal relatives. He, not she, must provide the transportation. He, not she, must establish an environment in his new home that eliminates friction.
The defendant has tried to develop a better relationship. He has taken some of the children on extended vacations and often accompanies the children on day trips. However, it is reasonable for the children to assume that they should be with their father when they visit him. There is evidence that the defendant and his companion often have plans outside the home during visitation times. The children should not be transported to their father's residence and then left to care for each other. The CT Page 9224 defendant must further recognize that visitation might be affected by the children's activities. Should he wish that a child abandon a particular activity, it is his responsibility to deal with the child. The primary marital asset is the marital home located at 401 Black Rock Turnpike in Easton, Connecticut. That property has a stipulated value of $900,000.00. The purchase price for the Easton home came from equity in prior marital homes, the defendant's pension funds and the labors of both parties. The plaintiffs mother contributed some money for home improvements.[18] The parties used a home equity line of credit to pay for other construction, landscaping and remodeling expenses.[19]
Additionally, the couple own a condominium in Stratford that had been purchased by the plaintiff shortly before this marriage. That condominium was the first marital residence. Although the plaintiff provided the initial down payment for the property, the defendant has contributed significant funds since the date of the marriage. The condominium, worth $100,000.00, is now rental property.
Neither party had significant assets at the time of the marriage. Each had small savings and a car. Additionally, the plaintiff inherited some money upon the death of her grandmother. The only major items of personal property were a piano and an antique dining room set.[20] Neither litigant had large student loans. The marital assets were the result of joint effort, not individual contributions prior to the marriage. These assets include the pension funds held by each individual. Additionally, the defendant maintains custodial bank accounts whose funds are designated for the children's education.
There are several family motor vehicles, some of which are used by the family's teenage children. The defendant has a separate interest in a 1972 Porsche race car that he purchased in 1996. The defendant spent long hours, some with his son Patrick, rebuilding that automobile.
During the early years of the marriage, the plaintiff was in charge of family finances. She paid all bills through funds the defendant deposited in a joint account. That arrangement changed upon the filing of the dissolution action. The parties have had difficulty managing family finances subsequent to the filing of this action. The plaintiffs liabilities have increased, partially because she has charged items for household maintenance. These charges have exceeded the alimony and child support awards provided in the pendente lite orders. To cover her expenses, the plaintiff has borrowed money from her mother and brothers. She has also depleted a joint account that originally held approximately $23,000.[21]
II. Orders CT Page 9225
The court has considered all the facts found in this memorandum of decision in light of the mandate of Connecticut General Statutes section46b-81. See Smith v. Smith, 185 Conn. 491, 493, 441 A.2d 140 (1981). The court, having considered all the evidence in light of all relevant statutory criteria, enters the following orders:
1. The marriage of the parties is dissolved on the grounds of an irretrievable breakdown.
2. The parties shall have joint legal custody of the five children issue of this marriage: Patrick born March 26, 1985; Jacqueline born May 29, 1986; Siobhan born October 23, 1988; Michaela born September 28, 1991; and Brendan born December 1, 1996. The primary residence of the children shall be with the plaintiff.
3. The defendant shall have reasonable, flexible and liberal rights of visitation to include, but not be limited to, Wednesday evenings, alternate weekends, time during the school year and summer vacation, and major holidays in alternate years. Additionally, the defendant shall have visitation with the children on two additional nights per month if the children are available.
4. The defendant shall be solely responsible for the costs associated with the transportation of these children. The defendant shall further be responsible for all physical transportation.
5. Brendan and any other child who so desires shall be allowed to sleep over on weekends and during school vacations.
6. The defendant shall have the option of having the children on three separate weeks of uninterrupted time during the summer school vacation and will notify the plaintiff in writing by March 31st of the weeks that he intends to exercise that access.
7. The parties shall alternate the following legal holidays and school vacations with the plaintiff having Schedule A for even-numbered years and Schedule B for odd-numbered years. The sharing of said holidays and school vacations shall supersede the regular visitation schedule. Said holidays shall be designated from 9 a.m. until 7 p.m. unless otherwise agreed by the parties or otherwise designated herein. This schedule may be modified upon agreement of the parties.
SCHEDULE A: Easter weekend; spring school vacation; Memorial Day weekend; Christmas Eve Day and Christmas Day. CT Page 9226
SCHEDULE B: Winter School Vacation; Independence Day; Labor Day weekend; Thanksgiving weekend; Christmas vacation as of December 26th, New Year's Eve and New Year's Day.
8. Regardless of the regular access schedule, the plaintiff shall have the children with her every Mother's Day and the defendant shall have the children with him every Father's Day. Said day is designated to be from 9 a.m. until 7 p.m. unless otherwise agreed by the parties.
9. Each parent is expected to adapt to the changing needs and interests of the minor children, and to arrange his or her schedule to accommodate the minor children's school activities, sport events, birthday party invitations, etc., remembering that such activities are an ordinary part of the children's development and that the minor children will enjoy those activities and benefit from them.
10. The defendant shall provide to or for the benefit of the minor children such medical and dental insurance as may be available through his employment, and the plaintiff shall reimburse the defendant for one-half of the cost thereof. In the event the defendant does not have such insurance available to him, the plaintiff shall provide to or for the benefit of the minor children like insurance as may be available through her employment, and the defendant shall reimburse the plaintiff for one-half of the cost thereof. The parties shall each be responsible for one-half of the cost of any uncovered or unreimbursed medical, dental, psychological or therapy expenses as may be reasonably necessary to or for the benefit of the minor children. Any unreimbursed medical, dental, psychological or therapy expenses incurred on behalf of the minor child shall be shared equally by the parties.
11. The defendant shall pay to the plaintiff unallocated alimony and child support in the amount of eight thousand dollars ($8,000) per month for sixty (60) months beginning August 1, 2002 and concluding July 1, 2007.
Beginning in August, 2007, the defendant will pay the plaintiff unallocated alimony and child support in the amount of five thousand dollars ($5,000) per month for sixty (60) months beginning August 1, 2006 and concluding July 1, 2012.
Before July 31, 2012, the parties shall return to court to determine an appropriate amount of support for the remaining minor child.
The alimony award shall terminate upon the happening of any of the following events, whichever first occurs: (a) the plaintiffs death; (b) the plaintiffs remarriage; (c) in the discretion of the court pursuant to CT Page 9227 Connecticut General Statutes section 46b-86 (b), or the plaintiffs cohabitation.
An immediate wage execution shall enter.
12. For tax purposes, the plaintiff may claim Patrick, Siobhan and Brendan as dependents for the calendar year ending December 31, 2002. The defendant may claim as dependents for that same year Jacqueline and Michaela. In the following year, the plaintiff may claim Jacqueline and Michaela; the defendant may claim Patrick, Siobhan and Brendan. These dependency exemptions shall alternate each year for so long as they are available.
13. A The plaintiff shall have exclusive use and possession of the marital home at 401 Black Rock Turnpike, Easton, Connecticut, until the sale of the home as hereinafter set forth.
B. During said time, the plaintiff shall be responsible for, and shall indemnify the defendant against, payment of the mortgage, home equity loans, property taxes and insurance and shall be allowed in full any tax deductions therefore.
14. During said time, the plaintiff shall also be responsible for any usual and ordinary maintenance and repair expense; the plaintiff and defendant shall be equally responsible for any capital or other expense in excess of $1,000.
15. The home shall be listed for sale on or before the date that Brendan completes the twelfth grade or attains the age of 19, whichever comes earlier.
16. If the parties are unable to agree on a listing price, the price shall be set by averaging the suggested listing price of each party's appraiser.
17. Any offer within ten (10%) percent of the listing price shall be accepted.
18. Upon the sale and after payment of the mortgage, broker's fee, attorney's fee and any other usual and customary closing expenses, the net proceeds shall be divided sixty (65%) percent to the plaintiff and thirty-five (35%) percent to the defendant.
19. Each party shall be responsible for any taxable gain in said proportion. CT Page 9228
20. The court shall continue to reserve jurisdiction over matters relating to the listing and sale of the property.
21. Neither party shall cause or allow the property to be further encumbered without the consent of the other party.
22. All of the furniture and furnishings in the marital home, with the exception of the defendant's personal papers and effects, the baby grand piano and the defendant's grandmother's sewing machine which are awarded to the defendant, shall be the property of the plaintiff. Additionally, the parties shall equally divide the family memorabilia.
23. The plaintiff is awarded the condominium located on Tudor Ridge in Strafford, Connecticut. The defendant shall quitclaim his interest in the property to the plaintiff who shall immediately refinance the property, assuming all debts and liabilities associated with the property. Until said time, the plaintiff shall be responsible for, and shall indemnify the defendant against, payment of the mortgage, property taxes and insurance and shall be allowed in full any tax deductions therefore.
24. The defendant is awarded all interest in his Porsche race car and motorcycle.
25. The plaintiff is awarded the following accounts listed on her financial affidavit: Waterhouse Account, Microsoft Account, all People's bank accounts, the St. Vincent Credit Union Account, the St. Vincent Savings Accounts, her MMA 401(k); MMA Money Purchase Plan, TD Waterhouse IRA. Additionally the plaintiff shall receive the defendant's IRA Fidelity account
26. The defendant is awarded the following accounts listed on his financial affidavit:
The Western he Federal Credit Union Account.
27. The parties shall share equally the Fidelity 401(b) account, the Janus 401(b) account and the defendant's pension with Danbury Hospital.
28. The parties shall prepare, and be equally responsible for, presenting this court with a plan to effectuate these transfers.
29. Each party shall maintain their separate interests in their pension plan accounts.
30. The plaintiff shall receive the 2000 Honda Odyssey and the 1987 Volvo. The plaintiff shall be responsible for any outstanding loan and CT Page 9229 shall indemnify and hold harmless the defendant from any claim or demand thereon. The defendant shall receive his motorcycle and the 1999 Land Cruiser. He shall be responsible for any outstanding loan and shall indemnify and hold harmless the plaintiff from any claim or demand thereon. 31. For as long as the defendant shall have an alimony or support obligation, he shall cause to have in force and effect a life insurance policy on his own life in the sum of at least $1,000,000, naming the plaintiff as the beneficiary thereof as and for trustee for the minor children. The defendant shall provide to the plaintiff satisfactory evidence thereof within thirty (30) days and at such other times as may be reasonably requested by the plaintiff.
32. Except to the extent more specifically set forth herein, each order of the court is to be effectuated within thirty (30) days of the date of this decision.
33. Except to the extent more specifically set forth herein, each party shall retain all assets as shown on her/his respective financial affidavits free and clear of any claim or demand by the other, and each party shall be responsible for all liabilities as shown on her/his financial affidavits and shall indemnify and hold harmless the other party from liability therefore.
Judgment shall enter in accordance with the foregoing orders.
DEWEY, J.